## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ABINGDON DIVISION

| | | |
|---|---|---|
| **KIMBERLY D. DYE,** | ) | |
| Plaintiff | ) | Civil Action No. 1:20cv00065 |
| | ) | |
| v. | ) | **REPORT AND** |
| | ) | **RECOMMENDATION** |
| **KILOLO KIJAKAZI,**[1] | ) | |
| **Acting Commissioner of Social** | ) | By: PAMELA MEADE SARGENT |
| **Security,** | ) | United States Magistrate Judge |
| Defendant | | |

### I. Background and Standard of Review

Plaintiff, Kimberly D. Dye, ("Dye"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying her claim for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C. § 423 *et seq.* Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a

---

[1] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Federal Rules of Civil Procedure Rule 25(d), Kilolo Kijakazi is substituted for Andrew Saul as the defendant in this suit.

preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Dye protectively filed her application for DIB on September 21, 2018, alleging disability as of August 21, 2018, based on back problems, including low back pain, spinal stenosis, spondylolisthesis and reversal of cervical lordosis curvature; numbness of her upper extremities; bilateral hand pain; depression; anxiety; stomach issues; and sleep issues. (Record, ("R."), at 12, 175-76, 203, 235.) The claim was denied initially and upon reconsideration. (R. at 91-93, 97-99, 102-05, 107-09.) Dye then requested a hearing before an administrative law judge, ("ALJ"). (R. at 110-11.) The ALJ held a hearing on March 3, 2020, at which Dye was represented by counsel. (R. at 30-52.)

By decision dated March 24, 2020, the ALJ denied Dye's claim. (R. at 12-23.) The ALJ found Dye met the nondisability insured status requirements of the Act for DIB purposes through December 31, 2023. (R. at 14.) The ALJ found Dye had not engaged in substantial gainful activity since August 21, 2018,[2] the alleged onset date. (R. at 14.) The ALJ determined that Dye had severe impairments, namely lumbar degenerative disc disease; cervical spondylosis; and depressive disorder, but he found Dye did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 14-15.) The ALJ found that Dye had the residual functional

---

[2] Therefore, Dye must show she was disabled between August 21, 2018, the alleged onset date, and March 24, 2020, the date of the ALJ's decision, to be eligible for benefits.

capacity to perform sedentary work[3] that allowed her the ability to stand for five minutes every hour while remaining at the workstation; that required no more than simple, routine tasks with few workplace changes; and that did not require work on an assembly line or work at a production rate pace. (R. at 16.) The ALJ found that Dye was unable to perform any of her past work. (R. at 22.) Based on Dye's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that a significant number of jobs existed in the national economy that Dye could perform, including the jobs of an envelope addresser, an information clerk and an order clerk. (R. at 22-23.) Thus, the ALJ concluded Dye was not under a disability as defined by the Act from August 21, 2018, through March 24, 2020, the date of the decision, and she was not eligible for DIB benefits. (R. at 23.) *See* 20 C.F.R. § 404.1520(g) (2020).

After the ALJ issued his decision, Dye pursued her administrative appeals, (R. at 293-95), but the Appeals Council denied her request for review. (R. at 1-5.) Dye then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981 (2020). This case is before this court on Dye's motion for summary judgment filed June 11, 2021, and the Commissioner's motion for summary judgment filed July 8, 2021.

## II. Facts

Dye was born in 1973, (R. at 22, 36, 175), which classifies her as a "younger person" under 20 C.F.R. § 404.1563(c). Dye has a high school education and past

---

[3] Sedentary work involves lifting items weighing up to 10 pounds with occasional lifting or carrying of articles like docket files, ledgers and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally, and other sedentary criteria are met. *See* 20 C.F.R. § 404.1567(a) (2020).

work as a bank branch manager. (R. at 36-37, 48, 204.) Dye testified she experienced panic attacks on the job once or twice a week. (R. at 39.) She stated, while working, she had to take a 10- to 15-minute break once an hour due to neck and back pain and had to lie down on her office floor once a day to relieve the pain. (R. at 40-41.) Dye stated she had tingling, numbness and weakness in her upper extremities, which made it difficult to handle objects. (R. at 42-43.)

Christine Slusarski, a vocational expert, also was present and testified at Dye's hearing. (R. at 47-51.) Slusarski was asked to consider a hypothetical individual of Dye's age, education and work history, who could perform sedentary work that allowed her the ability to stand for five minutes every hour while remaining at the workstation; that required no more than simple, routine tasks with few workplace changes; and that did not require work on an assembly line or work at a production rate pace. (R. at 48-49.) She stated the hypothetical individual could not perform Dye's past work, but, if the individual could remain productive while standing, a significant number of other jobs existed that such an individual could perform, including jobs as an envelope addresser, an information clerk and an order clerk. (R. at 49.) Slusarski stated there would be no jobs available should the individual be off task 20 percent of the workday. (R. at 49.)

In rendering his decision, the ALJ reviewed records from Jo McClain, Psy.D., a state agency psychologist; Dr. Catherine Howard, M.D., a state agency physician; Dr. Wyatt S. Beazley, III, M.D., a state agency physician; Dr. Sreeja Kadakkal, M.D., a state agency physician; C-Health of Lebanon, ("C-Health"); Highlands Neurosurgery, P.C.; Dr. Alison Whitman, M.D.; Lori M. Long, L.P.C.; David Dietrich, Ph.D., a licensed clinical psychologist; Dr. Wendy Abbott, D.O.; and Claypool Hill Physical Therapy.

Beginning in 2014 through 2017, Dye received treatment at C-Health for generalized anxiety disorder; depression; arthritis; back and neck pain; and gastroesophageal reflux disease, ("GERD"). (R. at 305, 308, 311, 314, 317, 319-20, 322, 325, 328, 331.) On April 21, 2016, an MRI of Dye's cervical spine showed degenerative disc space narrowing with spondylosis from C3-C4 through C5-C6; reversal of cervical lordotic curvature with borderline central canal stenosis at the C4 level; and uncinate spurring with mild foraminal stenosis on the left at the C4-C5 disc space. (R. at 337.) Dye participated in physical therapy on two occasions in October and November 2016, for her complaints of chronic neck pain. (R. at 629-31.) During this time, Dye had a normal gait, tone and strength; she had cervical paraspinous muscle tenderness with spasms; and she had an appropriate affect and demeanor and good insight and judgment. (R. at 300, 306, 309, 312, 315, 318, 320, 323, 326, 329, 332.) She routinely denied experiencing "true panic attacks." (R. at 299, 305, 308, 311, 314, 319.)

On February 20, 2017, Dye saw Dr. Jody B. Helms, M.D., a physician with Highlands Neurosurgery, P.C., for complaints of neck and low back pain and frequent numbness and tingling in both hands, and Dr. Helms ordered an MRI of Dye's lumbar spine. (R. at 415-16.) On March 6, 2017, Dye complained of back pain and bilateral lower extremity pain. (R. at 414.) An MRI of Dye's lumbar spine showed a grade 1 anterolisthesis of the L4-L5 level secondary to pars defects of the L4 level and a broad-based, concentric, annular deformity/disc herniation associated with mild central canal stenosis with bilateral neural foraminal narrowing at the L4-L5 level. (R. at 355-56.) Surgery was recommended. (R. at 414.) On March 21, 2017, Dye underwent a posterior lumbar interbody fusion at the L4-L5 level.  (R. at 341-47.) On April 6, 2017, Dye reported her right lower extremity radiculopathy had resolved. (R. at 379.) She was advised to remain active with a daily walking routine; gentle range of motion and stretching maneuvers; and to not lift objects weighing

more than 10 pounds. (R. at 379.) On April 27, 2017, Dye reported her back and leg pain had improved, and she was doing "quite well." (R. at 377.) She was advised to walk, stretch and be active within reason. (R. at 377.)

On June 1, 2017, Dye reported she was doing well, and her left leg pain had resolved. (R. at 373.) She was released back to work without restrictions. (R. at 373.) On June 9, 2017, Dye complained of back pain that radiated into her right upper arm. (R. at 296.) On examination, Dye had a normal gait, tone and strength; she had cervical and lumbar paraspinous muscle tenderness with spasms; she had bilateral wrist pain with a positive Tinel's sign; her affect and demeanor were appropriate; and she had good insight and judgment. (R. at 297.) Dye was diagnosed with back pain and carpal tunnel syndrome. (R. at 297.)

On August 21, 2017, Dye saw Brian K. Killen, P.A., a physician's assistant with Highlands Neurosurgery, P.C., for complaints of back pain. (R. at 370.) She reported surgery was helpful and had provided relief of her left leg symptomatology. (R. at 370.) Dye reported muscle relaxers and anti-inflammatory medication helped her a "little bit." (R. at 370.) Killen reported Dye could move all extremities; she had symmetrical grip; her reflexes were slightly hypoactive; her dorsiflexion and plantar flexion were intact; her gait was slightly guarded; she showed no signs of spasticity or myelopathy; she had tenderness over the right S1 joint; and her upper and lower extremity strength was symmetrical at 4/5. (R. at 370.) X-rays of Dye's lumbar spine showed an intact L4-L5 diskectomy/posterior fusion. (R. at 372.) Killen recommended conservative treatment and ordered physical therapy. (R. at 370.) On November 30, 2017, Dye reported her left-sided symptoms had resolved completely, but she continued to have right-sided lumbar pain with occasional right thigh pain. (R. at 351.) On December 21, 2017, Dye had a right L5-S1 diagnostic facet injection. (R. at 348-50.)

On June 12, 2018, Dye established care with Dr. Alison Whitman, M.D., for her complaints of back, neck and arm pain and numbness and tingling in her upper extremities. (R. at 514-16.) Dye's extremities had no clubbing, cyanosis or edema; her neck and back range of motion was moderately limited; straight leg raise testing was negative, bilaterally; she had a normal gait; and she had a normal mood and affect. (R. at 515.) Dr. Whitman diagnosed nicotine dependence; back pain, chronic; cervicalgia; and depression. (R. at 516.) On June 13, 2018, an MRI of Dye's cervical spine showed reversal of the cervical lordosis from the C4-C6 disc space with associated moderate spinal canal stenosis and degenerative changes and probable osseous congenital fusion at the C2-C3 level. (R. at 513.) On June 28, 2018, Dye reported that Cymbalta helped her symptoms. (R. at 510.) She denied insomnia, anxiety and depression. (R. at 510.) Dr. Whitman reported Dye had a normal gait; she had no joint swelling or involuntary movements; her insight and judgment were intact; and she had a normal mood and affect. (R. at 512.)

On July 5, 2018, Dye saw Chris A. Tickle, A.N.P., an adult nurse practitioner with Highlands Neurosurgery, for complaints of chronic right buttock, thigh, neck and arm discomfort. (R. at 523.) Dye denied anxiety, depression and sleep disturbances. (R. at 523.) Tickle reported that Dye was well groomed; she had an appropriate mood and affect; her tendon reflexes were brisk in her extremities; she had a negative Hoffman's sign on the right and intermittent on the left; her gait was guarded; her cervical spine showed no obvious bony deformity, edema, erythema or ecchymosis; she had no impingement of the shoulders; she had no focal weakness or asymmetric muscular atrophy in the extremities; and she had a negative Tinel's sign at both wrists and elbows. (R. at 524.) Tickle diagnosed degenerative

spondylosis at the C4-C5 disc space, and a corpectomy[4] at the C4 disc space was discussed. (R. at 524.)

On August 23, 2018, Dye reported right arm pain and family-related stressors. (R. at 503.) Dr. Whitman reported Dye's extremities had normal range of motion and no clubbing, cyanosis or edema; she had a normal gait; and she was tearful and sad. (R. at 505.) On October 12, 2018, Dye complained of anxiety, stress, chronic pain and insomnia and asked Dr. Whitman to complete her disability papers. (R. at 495.) Dye had a normal gait; she had no joint swelling or involuntary movements; her insight and judgment were intact; her affect was anxious and tearful; her speech was pressured and tangential; she had difficulty focusing; her neck range of motion was severely limited in all directions; and her lower back range of motion was severely limited in all directions. (R. at 497.) Dr. Whitman advised Dye to quit her job. (R. at 495.)

That same day, Dr. Whitman completed a medical assessment, finding Dye could lift and carry objects weighing five pounds; she could stand and/or walk less than one-third of the workday and could do so for up to 10 minutes without interruption; she could sit less than one-third of the workday and could do so for up to 10 minutes without interruption; she could never climb, stoop, kneel, balance, crouch or crawl; she had a limited ability to reach, to handle, to feel and to push and pull; and she was restricted from working around heights, moving machinery and vibration. (R. at 532-34.) She opined Dye would miss more than two days of work a month due to her impairments. (R. at 534.)

---

[4] A corpectomy is a surgical procedure, during which the vertebral bodies and adjacent vertebral discs are removed to alleviate the pressure on the spinal cord causing spinal stenosis and cervical myelopathy. *See* https://www.spine-health.com/glossary/corpectomy (last visited Dec. 13, 2021).

On October 16 and 22, 2018, Dye saw Lori M. Long, L.P.C., for counseling. (R. at 540-43.) Dye reported she worried about her and her husband's health and finances. (R. at 540.) She reported she had suffered tremendous loss with the passing of her mother and a close friend. (R. at 542.) Long diagnosed anxiety; depression; obsessive compulsive disorder; and to rule out post-traumatic stress disorder, ("PTSD"). (R. at 540.)

On November 30, 2018, Dr. Whitman reported Dye had several trigger points in her back, neck, shoulders and legs, which qualified her for a fibromyalgia diagnosis. (R. at 547.) Dye reported numbness and tingling in her right arm. (R. at 547.) Dye had a normal gait; she had no joint swelling or involuntary movements; her insight and judgment were intact; her affect was anxious and tearful at times; and her neck and back range of motion was severely limited. (R. at 548-49.)

On December 3, 2018, Dr. Catherine Howard, M.D., a state agency physician, completed a medical assessment, finding Dye could perform light work.[5] (R. at 61-62.) She found Dye could occasionally climb, balance, stoop, kneel, crouch and crawl. (R. at 62.) Dr. Howard found Dye had no manipulative, visual, communicative or environmental limitations. (R. at 62.)

On December 3, 2018, Jo McClain, Psy.D. a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), indicating Dye suffered from severe depressive, bipolar and related disorders and anxiety and obsessive-compulsive disorders. (R. at 59-60.) She opined Dye had no limitations on her ability to understand, remember or apply information; mild limitations on her ability to

---

[5] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, she also can perform sedentary work. *See* 20 C.F.R. § 404.1567(b) (2020).

interact with others and to adapt and manage herself; and moderate limitations on her ability to concentrate, persist or maintain pace. (R. at 59-60.)

That same day, McClain also completed a mental assessment, indicating Dye had moderate limitations[6] in her ability to carry out detailed instructions; to maintain attention and concentration for extended periods; to work in coordination with or in proximity to others without being distracted by them; and to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (R. at 63-64.) McClain stated Dye's work-related mental abilities were, otherwise, not significantly limited. (R. at 63-64.) McClain opined Dye was able to complete a normal workweek and to perform at a generally consistent pace with others, with only minimal need for accommodations on an infrequent basis. (R. at 63.)

Dye continued to see Dr. Whitman throughout 2019. During this time, Dye reported her pain, fibromyalgia, thyroid, depression and anxiety were stable with her medication regimen, which made it tolerable to do her activities of daily living. (R. at 578, 584, 590, 594, 605, 611, 617.) Dye had a carpal tunnel injection, which she reported helped with her carpal tunnel syndrome. (R. at 611, 617.) Although Dye complained that her arm continued to fall asleep, Dr. Whitman related this to her back. (R. at 611, 617.) Dr. Whitman regularly reported Dye had a normal gait; she had no joint swelling or involuntary movements; she had limited range of motion in her low back and neck; she had weakness in her lower and upper extremities with

---

[6] The regulations define a moderate limitation as "functioning in this area independently, appropriately, effectively, and on a sustained basis is fair." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(F)(2)(c) (2020).

4/5 strength; her insight and judgment were intact; and her affect and mood were normal. (R. at 572, 578, 584, 594, 605, 614, 619.)

On March 6, 2019, Long completed a mental assessment, finding Dye had no limitation in her ability to relate to co-workers and to maintain personal appearance. (R. at 556-58.) She found Dye had slight limitations in her ability to follow work rules; to deal with the public; to use judgment in public; to interact with supervisors; and to understand, remember and carry out simple job instructions. (R. at 556-57.) Long opined Dye had a satisfactory ability to understand, remember and carry out detailed job instructions; to behave in an emotionally stable manner; to relate predictably in social situations; and to demonstrate reliability. (R. at 556-57.) She found Dye had a seriously limited ability to understand, remember and carry out complex job instructions and no useful ability to deal with work stresses; to function independently; and to maintain attention and concentration. (R. at 556-57.) Long opined Dye would be absent from work more than two days a month. (R. at 558.)

On May 2, 2019, David Dietrich, Ph.D., a licensed clinical psychologist, evaluated Dye at the request of Disability Determination Services. (R. at 560-63.) Dietrich reported Dye made appropriate eye contact; her hygiene and grooming were good; she displayed no psychomotor abnormalities; her affect was friendly, but she became slightly tearful several times; her affect was mildly labile, full range, normal intensity and congruent to content; her speech was normal; her thought content was void of a formal thought disorder; her attention was intact; her concentration for short-term tasks was intact; her short-term memory was intact; her recent and remote memory were intact; and her fine and gross motor skills were within normal limits. (R. at 561-63.) Dye scored 30/30 on the Mini-Mental State Exam, ("MMSE"),[7] and

---

[7] The MMSE is an 11-question measure that tests five areas of cognitive function: orientation, registration, attention and calculation, recall and language. The maximum score is 30.

Dietrich assessed her intelligence in the low average range. (R. at 562.) Dietrich noted Dye had normal psychiatric independence in her daily activities.[8] (R. at 562.) Dye reported she had good relationships with her family members, co-workers and supervisors. (R. at 562-63.) Dietrich indicated Dye's presentation was consistent with a mild somatic symptom disorder, exacerbated by external stressors, such as her daughter's sexual orientation, financial concerns and unemployment. (R. at 562.) Dietrich diagnosed somatic symptom disorder, with predominant pain, persistent, mild; and major depressive disorder, single episode, mild. (R. at 563.)

Dietrich opined Dye could comprehend simple and detailed job instructions; her concentration and persistence were adequate to meet the demands of simple or some detailed work-related decisions, but her chronic pain could detract from the accuracy and reliability of her judgment; she was mildly to moderately impaired in her ability to interact with others in an appropriate manner; and she had no impairments in her ability to adapt to changes in the workplace or in her ability to be aware of normal hazards or to take appropriate precaution. (R. at 563.) Dietrich opined that Dye's physical problems "may detract" from her ability to maintain attendance and meet an employment schedule. (R. at 563.)

On May 11, 2019, Dye reported to Dr. Wendy Abbott, D.O., that she filed for disability based on back, neck and arm pain. (R. at 566.) Dr. Abbott reported Dye had a normal gait; her grip strength was 5/5 with adequate fine motor movements, dexterity and ability to grasp objects, bilaterally; her extremities did not have edema,

---

A score of 23 or lower is indicative of cognitive impairment. *See* https://cgatoolkit.ca/Uploads/ContentDocuments/MMSE.pdf (last visited Dec. 13, 2021).

[8] Dye reported she watched YouTube videos and television; she went shopping for groceries "regularly;" she managed the household finances and her own treatment; she attended church services up to three times a month; and that she performed housecleaning chores and cooking. (R. at 562.)

cyanosis or erythema; she had positive straight leg raising tests, bilaterally; she had good muscle tone and full muscle strength; she had intact sensation; she had normal reflexes; she was cooperative; she did not appear depressed or anxious; she was able to communicate with no deficits; her recent and remote memory were intact; and she had good insight and cognitive function. (R. at 567-68.) She had decreased range of motion of the cervical spine, hip and right shoulder. (R. at 569.) Dr. Abbott observed Dye was able to "sit in no significant distress, walk, and stand here in office." (R. at 568.) She reported Dye did not show any signs of mood instability or concentration difficulty. (R. at 568.) Dr. Abbott stated that, due to Dye's pain, she would "unlikely" be able to walk and/or stand for a full workday; she "may be able to sit for a partial workday with allotted occasional breaks every 30 minutes;" she should be limited to lifting or carrying objects weighing less than five pounds; and she should refrain from excessive bending, stooping and crouching. (R. at 568.)

On May 30, 2019, Dr. Sreeja Kadakkal, M.D., a state agency physician, completed a PRTF, indicating Dye suffered from nonsevere depressive, bipolar and related disorders; anxiety and obsessive-compulsive disorders; and somatic symptom and related disorders. (R. at 77-79.) Dr. Kadakkal opined Dye had no limitations on her ability to understand, remember or apply information or to adapt or manage herself and mild limitations on her ability to interact with others and to concentrate, persist or maintain pace. (R. at 78.)

On May 30, 2019, Dr. Wyatt S. Beazley, III, M.D., a state agency physician, completed a medical assessment, finding Dye could perform light work. (R. at 81-83.) He found Dye could occasionally climb, balance, stoop, kneel, crouch and crawl. (R. at 82.) Dr. Beazley found Dye had no manipulative, visual, communicative or environmental limitations. (R. at 82-83.)

On January 13, 2020, Dye reported her depression, fibromyalgia and chronic pain were stable with medication. (R. at 638.) Dr. Whitman reported Dye had a normal gait; she had no joint swelling or involuntary movements; she had "extreme limited" range of motion in her neck and low back; her insight and judgment were intact; and her affect and mood were normal. (R. at 638.) That same day, Dr. Whitman completed a medical assessment, finding Dye could lift and carry items weighing up to five pounds; she could stand, walk and/or sit up to two hours in an eight-hour workday and could do so for up to 15 minutes without interruption; she could never climb, stoop, kneel, balance, crouch and crawl; she had a limited ability to reach, to handle, to feel and to push and pull; and she was restricted from working around heights, moving machinery and vibration. (R. at 626-28.) Dr. Whitman opined Dye would be absent from work more than two days a month. (R. at 628.)

On February 10, 2020, Dye reported her chronic neck and low back pain were stable on medication. (R. at 633.) Dr. Whitman reported Dye had a normal gait; she had no joint swelling or involuntary movements; she had "very little" range of motion in the low back; her insight and judgment were intact; and her affect and mood were normal. (R. at 633.)

## III. Analysis

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2020). *See also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. § 404.1520. If the Commissioner finds

conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a)(4) (2020).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C. § 423(d)(2)(A); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Dye argues the ALJ erred by improperly determining her residual functional capacity by failing to properly consider the opinions of Long, Dr. Whitman and Dr. Abbott. (Plaintiff's Memorandum In Support Of Her Motion For Summary Judgment, ("Plaintiff's Brief"), at 4-6.) Dye contends the ALJ improperly relied on

the state agency consultants' assessments which were "stale [and] outdated." (Plaintiff's Brief at 5-6.)

Because this matter involves a claim filed after March 27, 2017, a new regulatory framework applies to the ALJ's evaluation of medical opinions in the record. For applications filed on or after March 27, 2017, the Social Security Administration, ("SSA"), has enacted substantial revisions to the regulations governing the evaluation of opinion evidence. *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01, 2017 WL 168819 (Jan. 18, 2017) (technical errors corrected by 82 Fed. Reg. 15132-01, 2017 WL 1105368 (Mar. 27, 2017)). Under the new regulations, ALJs no longer are required to assign an evidentiary weight to medical opinions or to accord special deference to treating source opinions. *See* 20 C.F.R. § 404.1520c(a) (2020) (providing that ALJs "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's] medical sources").[9]

Instead, an ALJ must consider and articulate how *persuasive* he finds all the medical opinions and all prior administrative medical findings in a claimant's case record based on the following factors: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) other factors that tend to support or contradict the opinion. *See* 20 C.F.R. § 404.1520c(b), (c)(1)-(5) (2020)

---

[9] The new regulations define a "medical opinion" as "a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions" in the abilities to perform the physical, mental or other demands of work activity or to adapt to environmental conditions. 20 C.F.R. § 404.1513(a)(2) (2020). Those regulations also define a "prior administrative medical finding" as a "finding, other than the ultimate determination about whether [a claimant is] disabled, about a medical issue made by [the SSA's] Federal and State agency medical and psychological consultants at a prior level of review." 20 C.F.R. § 404.1513(a)(5) (2020).

(emphasis added). Moreover, when a medical source provides more than one opinion or finding, the ALJ will evaluate the persuasiveness of such opinions or findings "together in a single analysis" and need not articulate how he or she considered those opinions or findings "individually." 20 C.F.R. § 404.1520c(b)(1) (2020).

In evaluating the persuasiveness of an opinion or finding, the SSA deems supportability and consistency "the most important factors," and, thus, the ALJ must address those two factors in evaluating the persuasiveness of medical opinions or prior administrative medical findings. 20 C.F.R. § 404.1520c(b)(2) (2020).[10] In evaluating the supportability of a medical opinion, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) … the more persuasive the medical opinions … will be." 20 C.F.R. § 404.1520c(c)(1). In assessing the consistency factor, "[t]he more consistent a medical opinion(s) … is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) … will be." 20 C.F.R. § 404.1520c(c)(2).

The new regulations also alter the way the ALJ discusses the medical opinions or findings in the text of the decision. *See* 20 C.F.R. § 404.1520c(b)(2). After considering the relevant factors, the ALJ is not required to explain how he considered each of them. Instead, when articulating his finding about whether an opinion is persuasive, the ALJ need only explain how he considered "the most important factors" of supportability and consistency. *See* 20 C.F.R. §

---

[10] "Supportability" means "[t]he extent to which a medical source's opinion is supported by relevant objective medical evidence and the source's supporting explanation." Revisions to Rules, 82 Fed. Reg. at 5853; *see also* 20 C.F.R. § 404.1520c(c)(1). "Consistency" denotes "the extent to which the opinion is consistent with the evidence from other medical sources and nonmedical sources in the claim." Revisions to Rules, 82 Fed. Reg. at 5853; *see also* 20 C.F.R. § 404.1520c(c)(2).

404.1520c(b)(2). The ALJ may comment on the other factors, including the source's relationship with the claimant, but generally has no obligation to do so. *See* 20 C.F.R. § 404.1520c(b)(2)-(3) (2020).

When the ALJ finds two or more opinions or findings about the same issue are both equally well-supported and consistent with the record, but are not exactly the same, the ALJ must consider the most persuasive factors, including the nature and extent of the medical source's relationship with the claimant and area of specialization, as well as the catch-all "other factors that tend to support or contradict a medical opinion or prior administrative medical finding." 20 C.F.R. § 404.1520c(b)(3), (c)(3)-(5).

The ALJ found that Dye had the residual functional capacity to perform sedentary work that allowed her the ability to stand for five minutes every hour while remaining at the workstation; that required no more than simple, routine tasks with few workplace changes; and that did not require work on an assembly line or work at a production rate pace. (R. at 16.) A claimant's residual functional capacity refers to the most the claimant can still do despite her limitations. *See* 20 C.F.R. § 404.1545(a) (2020).

In making his residual functional capacity finding, the ALJ found the opinions of Dr. Whitman, Long and Dr. Abbott "not persuasive." (R. at 19-20.)  The ALJ found Dr. Whitman's opinions "not persuasive" because her examination results showed Dye ambulated normally without deficits in her strength, which failed to support the inability to lift more than five pounds. (R. at 19.) He also found Dr. Whitman's limitations on Dye's ability to sit, to stand and to walk were not supported by the evidence. (R. at 19.) Dr. Whitman found that, although Dye had limited range of motion in her neck and back and weakness in her upper and lower

extremities, she had a normal gait; she had no joint swelling or involuntary movements; and she had 4/5 strength in her upper and lower extremities. (R. at 497, 505, 512, 515, 548-49, 572, 578, 584, 594, 605, 614, 619, 633, 638.)

Likewise, the ALJ found Dr. Abbott's opinion "not persuasive" because her mild objective findings failed to support her limitations. (R. at 20.) Dr. Abbott reported Dye had a normal gait; her grip strength was 5/5 with adequate fine motor movements, dexterity and ability to grasp objects, bilaterally; her extremities did not have edema, cyanosis or erythema; she had positive straight leg raising tests, bilaterally; she had good muscle tone and full muscle strength; she had intact sensation; and she had normal reflexes. (R. at 567-69.) She had a decreased range of motion of the cervical spine, hip and right shoulder. (R. at 569.) In addition, Dr. Abbott observed Dye was able to "sit in no significant distress, walk, and stand here in [the] office." (R. at 568.)

The record shows Dye's gait, tone and strength were normal; her tendon reflexes were brisk in her extremities; she had a negative Hoffman's sign on the right and intermittent on the left; she had no focal weakness or asymmetric muscular atrophy in the extremities; and she had a negative Tinel's sign at both wrists and elbows. (R. at 297, 524.) In addition, Dye reported her pain, fibromyalgia, thyroid, depression and anxiety were stable with her medication regimen, which made it tolerable to do her activities of daily living. (R. at 578, 584, 590, 594, 605, 611, 617.) "If a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler,* 785 F.2d 1163, 1166 (4th Cir. 1986).

The ALJ found the state agency physicians' opinions that Dye could perform a limited range of light work "partially persuasive." (R. at 20-21.) However, based on Dye's subjective complaints, the ALJ limited Dye to sedentary work. (R. at 21.)

The ALJ found this residual functional capacity finding was consistent with Dye's treatment notes that showed Dye was in no acute distress; she ambulated with a normal gait; and she had good muscle and grip strength despite experiencing range of motion limitations in her cervical and lumbar spine, as well as positive straight leg raise testing. (R. at 21.)

The ALJ found Long's opinion "not persuasive" because her examination findings failed to support such extreme limitations. (R. at 19.) Long opined Dye had a seriously limited ability to understand, remember and carry out complex job instructions and no useful ability to deal with work stresses; to function independently; and to maintain attention and concentration. (R. at 556-57.) The ALJ found Dietrich's opinion concerning Dye's ability to perform simple tasks "persuasive" because it was supported by his examination findings that showed her memory, attention and concentration were intact. (R. at 20, 561.) However, the ALJ found Dietrich's opinion that Dye was moderately limited in her ability to interact appropriately "less persuasive" because she related well and was noted to be friendly and cooperative. (R. at 20, 560-61.) Dr. Abbott reported Dye was cooperative; she did not appear depressed or anxious; she was able to communicate with no deficits; her recent and remote memory were intact; and she had good insight and cognitive function. (R. at 567-68.) In addition, the record shows that, on occasion, Dye was anxious and tearful, (R. at 497, 548, 561), but she routinely had an appropriate affect and demeanor; she had good insight and judgment; she had normal speech; her thought content was void of a thought disorder; her attention and concentration were intact; and her recent and remote memory were intact. (R. at 297, 512, 515, 524, 561, 572, 578, 584, 594, 605, 614, 619, 633, 638.) Furthermore, Dye regularly reported her symptoms of depression and anxiety were controlled with medication. (R. at 578, 584, 590, 594, 605, 611, 617, 633, 638.)

The ALJ found the opinion of state agency psychologist McClain "persuasive" because it was supported by the medical evidence available at the time of the opinion. (R. at 21.) The ALJ also found McClain's opinion "consistent" with Dye's treatment notes that showed her depression was stable with medication and there were no deficits in her memory, attention span or concentration. (R. at 21.) He further found McClain's opinion to be consistent with Dietrich's opinion that Dye could perform simple work based on her intact memory, attention and concentration. (R. at 21.)

Based on this, I find that substantial evidence exists to support the ALJ's consideration of the medical evidence and his residual functional capacity finding.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1. Substantial evidence exists in the record to support the ALJ's consideration of the opinion evidence;

2. Substantial evidence exists in the record to support the ALJ's residual functional capacity finding; and

3. Substantial evidence exists in the record to support the Commissioner's finding that Dye was not disabled under the Act and was not entitled to DIB benefits.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny Dye's motion for summary judgment, grant the Commissioner's motion for summary judgment and affirm the Commissioner's decision denying benefits.

## **Notice to Parties**

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

       Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, Senior United States District Judge.

       The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

       DATED:    December 13, 2021.

       /s/ *Pamela Meade Sargent*

       UNITED STATES MAGISTRATE JUDGE